ESERNIA v. OVERLAND MOVING CO. et al.

No. 7195.   Decided May 31, 1949.   (205 P. 2d 621.)

See 42 C. J., Motor Vehicles, sec. 952; 5 Am. Jur. 626. Failure of guest to leave automobile as contributory negligence, note, 154 A. L. R. 924.

*Skeen, Thurman & Worsley,* Salt Lake City, for appellant.

*Ingebretsen, Ray, Rawlins, & Christensen* and *Joseph S. Jones,* Salt Lake City, for respondent.

PRATT, Chief Justice.

Steven M. Esernia, the appellant herein, commenced this action to recover from the Overland Moving Co., and Thomas C. Jones, respondents herein, for injuries sustained in an accident which occurred while he was riding in a

truck which was owned by the Overland Moving Company, and was being driven by Thomas C. Jones, an employee of that company. This appeal is from a directed verdict in favor of the respondents.

Appellant testified that about 10 o'clock on the evening of June 24, 1943, he and a friend, a fellow Marine, were at a hamburger stand located on the outskirts of Elko, Nevada, when respondent Thomas C. Jones drove a big furniture van belonging to respondent, Overland Moving Co., up to that stand and invited the two marines to accompany him to Salt Lake City, Utah. Either before they entered the vehicle, or as they were entering, or else after they entered but before they left Elko, the driver of the truck informed them that he would like their company because he was tired and weary and sleepy. Esernia also testified that he (the driver) also told them that he had driven straight through from San Francisco without sleep or rest. The marines accepted the offer of the ride to Salt Lake City, and the appellant who was sleepy dozed off shortly thereafter. Sometime thereafter he awakened and then he felt the van bouncing along the shoulder of the road. The driver pulled the van back onto the road and said that he must have dozed off himself. This occurred somewhere between one and four hours after leaving Elko. The driver then requested the boys to talk to him so that he would remain awake. The driver told them that he wouldn't mind if one of them went to sleep, but he did not want both of them to go to sleep at the same time as that would cause him to fall asleep also. The marines then engaged in conversation with the driver during the course of the ride, during which they passed through a couple of small towns but did not stop at any of these places. The trip was uneventful until about 6 o'clock on the morning of June 25th, when they reached a curve about a mile west of Black Rock Beach in Salt Lake County, on U. S. Highway 40 and 50 where the van veered all the way across the road onto the shoulder and after traveling some distance turned

around and tipped over, causing the injuries complained of by appellant herein.

The driver testified that he had made more than one overnight stop since leaving San Francisco, and had stopped over in Elko on the night of the 23rd of June and had remained there the entire day of the 24th so that he would avoid riding during the heat of the day over the desert. Defendants introduced receipts for gas and motel bills corroborating this story. At most this conflict in evidence would only have presented to the jury a question as to whether or not the driver had driven straight through from San Francisco. It did not rebut in any way the uncontroverted testimony that the driver told the marines that he was tired and sleepy. These conversations, testified to by the appellant, were never denied by the driver. The appellant is very positive in his testimony that the driver told him and Meredith that he (the driver) was tired and sleepy. This is a part of his testimony on that subject:

"We were standing there talking to the girls. We were going to stay with the girls that night. This driver pulled up along side of us. He stopped his truck and asked us if we wanted a ride, and we told him we were going to stay in that town. We sort of figured that if we went all the way to Salt Lake we would not be able to get back in time. He told us that he was tired and wanted someone to keep him company on the road so that he would not fall asleep, and he asked us if we would not go with him."

"Q. Did the driver of the truck tell you that he was sleepy more than twice on the trip? A. I don't know how many times he told me, but I know he told me.

"Q. He told you he was tired and sleepy at the time he picked you up; is that correct? A. Yes sir.

"Q. Then he told you he was tired and sleepy about two hours afterward; is that correct? A. I think he told us he was tired and sleepy after that first time he went on the shoulder, that was about, maybe two or three hours afterwards.

"Q. He did tell you he was tired and sleepy before you got on the truck? A. I don't know if we were in the truck or getting in the truck. I know it was in Elko there.

"Q. Before you started on the trip, at any rate? A. Yes sir."

The driver also testified that he had made two stops after picking up the two marines, one at Wendover, and one at Delle, Utah; that at one of these stops he awakened appellant's companion to ask him if he wanted a cup of coffee, but the latter refused. He did not awaken appellant who was also asleep. This conflict in testimony would raise only a question for the jury to determine whether or not the marines had stayed awake during the passage of the truck through those towns and does not raise any controversy as to whether or not the driver was sleepy.

The driver of the van, in a statement made to the police shortly after the accident, said he did not know what had happened but that he "must have dozed or something." He testified that he remembered having waved at the driver of a car just before he came to the curve which he failed to negotiate but that he could not recall what happened after that until the van had left the road and hit the gravel. He then attempted to regain control of the car and steer in between a culvert and some guard rails which were located on the northerly side of the curve, but he failed to gain control of his vehicle and it ran into the guard rails knocking down a couple of its posts as a result of which the front wheels were torn off and the van tipped over.

Appellant contends that the court erred in directing a verdict in favor of respondent herein, because the evidence was sufficient to submit to the jury the questions of willful misconduct under Sec. 57-11-7, U. C. A. 1943, and assumption of risk and contributory negligence.

Respondents argue that it is not material whether the driver was guilty of willful misconduct because the evidence clearly shows that appellant was guilty of contributory negligence and that he assumed the risk. They cite *Maybee* v. *Maybee,* 79 Utah 585, 11 P. 2d 973; *Markovich* v. *Schlafke,* 230 Wis. 639, 284 N. W. 516, and *Rennolds' Adm'x* v. *Waggener,* 271 Ky. 300, 111 S. W. 2d 647. We quote from *Maybee* v. *Maybee* [79 Utah 585, 11 P. 2d 975]:

"*   *   * There is no evidence that plaintiff protested against her mother's driving without glasses or that she offered to do the driving after the glasses were broken. It is not disputed that every fact, circumstance, and condition relied on by the plaintiff as constituting negligence on the part of the defendant was fully known to and appreciated by plaintiff, and that, notwithstanding her knowledge of the defect in the eyesight of her mother and the fact that she was driving without the aid of glasses, the plaintiff paid no attention to the conditions in the road, but was content to sit by and read a book while her mother was driving at a speed of forty to forty-five miles an hour. If it was negligence for the defendant to drive at this speed with her vision impaired as it was, and without the aid of glasses, it would follow that, where all these facts are fully known to and appreciated by the plaintiff, and notwithstanding such facts and such knowledge she was willing to be driven in the car, she not only assumed the risk or hazard to her own safety, which resulted from such driving, but, by her acquiescence, was guilty of independent negligence which contributed to the accident. The plaintiff identified herself with whatever negligence there was on the part of the mother because of her knowledge of all such facts and her approval, consent, and acquiescence in the driving of the car by her mother."

The evidence was uncontroverted that appellant knew that the driver was sleepy at the time he accepted the ride and also when the truck ran off the road the first time. Thereafter he had an opportunity to leave the truck when it stopped at Wendover or Delle, or he could have left the truck at any other of the towns between Elko and the point of the accident, of the existence of which this court can take judicial notice, but he did not leave. The Restatement of the Law of Torts, vol. 2, Sec. 466, states that a plaintiff's contributory negligence may be

"(a) an intentional and unreasonable exposure of himself to danger created by the defendant's negligence of which danger the plaintiff knows or has reason to know, *   *   *" and that "*   *   * (c) *   *   * a common form of the type of contributory negligence dealt with in clause (a) consists of the plaintiff's entrusting his safety to a third person whom he knows to be incompetent, customarily negligent or ill-equipped *   *   *. Where the plaintiff is ignorant of the person by whom, and the vehicle in which, he is offered a ride

until after the ride has begun, he may be negligent in not asking to be allowed to get out of the car. Whether his failure to do so is contributory negligence depends upon the circumstances in the particular case. A factor of particular importance is the extent of the known incompetence or carelessness of the driver or of the bad condition of the car as compared with the disadvantages of the position in which the plaintiff will be if he leaves the car. Thus, if the incompetence of the driver is discovered at a point at which the plaintiff might obtain other means of transportation or without danger or serious inconvenience walk home or to his destination, it would be contributory negligence to continue in the car. On the other hand, if the incompetence is not discovered until the vehicle is on a lonely road in a part of the country with which the plaintiff is unfamiliar, particularly late at night, it may be the part of prudence to remain in the vehicle, unless the driver is so reckless or incompetent that a reasonable man would recognize that there was a great likelihood of an accident.  *  *  *"

As we have indicated, the possibilities of leaving the truck were numerous enroute, and in addition the appellant was aware of the condition of the driver when he accepted the invitation to ride, even before they left Elko. Under these circumstances and evidence, a jury could not reasonably find to the contrary.

To summarize: Plaintiff's case is no stronger than his own testimony; and by that testimony he was told of the driver's sleepy condition, the result of driving from San Francisco. Plaintiff saw that condition, and saw its results. He was asked to ride in order to help keep the driver awake. There is no question about his knowledge of the driver's dangerous physical condition.

Judgment of the lower court is affirmed. Costs to the respondent.

WOLFE, LATIMER, and McDONOUGH, JJ., concur.

WADE, Justice (dissenting).

I dissent. I cannot agree with the statement in the prevailing opinion that

"* * * These conversations, testified to by appellant, were never denied by the driver. * * *"

It is true that the driver did not in so many words deny that he said to the appellant that he was tired and sleepy; however, he was not questioned in such a manner as to require a categorical denial of the conversations testified to by appellant. His denial of the truth of the conversations related by appellant took the form of relating circumstances which would tend to prove that the conversations could not have taken place as related by appellant. He testified that he had made more than one stop since leaving San Francisco and had stopped overnight in Elko. This clearly contradicted appellant's version of the conversation to the effect that the driver had said he was tired and sleepy because he had driven straight through from San Francisco without any rest. The driver further testified that he had not solicited the marines' company, but that they had "thumbed a ride" from him. The following is the driver's testimony as to the incident:

"A. * * * I checked all my tires, and I started to pull out. As I got out to the edge of town, to get out of Elko, these two Marines were standing there, almost out to the edge of the city limits. They 'thumbed' me for a ride, and I picked them up.

"Q. Did you have any conversation? A. I told them I was not supposed to pick them up; but they were boys in the service, and I would give them a ride."

This testimony, in my opinion, does rebut appellant's testimony to the effect that he was asked to ride with the driver because the driver was weary and sleepy. The driver's version, if believed, tends to prove that he did not ask the marines to ride with him, but that on the contrary and against the orders of his employers, he allowed them to ride with him as a favor to them and at their solicitation, because he had once been a member of the armed forces himself. Such a version of what happened when he picked up the marines plus the evidence that he had a good deal of rest before leaving Elko is a clear rebuttal of appellant's

statements that the driver told him he was weary and sleepy because he had been driving without stopping since leaving San Francisco.

The prevailing opinion seems to go on the assumption that since appellant's own testimony precludes him from recovering, it must be considered to be true and not capable of being controverted by the opposing party. I do not so understand the law.

The evidence here was not undisputed that appellant knew the driver was sleepy and that it was dangerous to ride with him. A jury could have reasonably believed the respondent and found from the evidence that appellant did not know that the driver was sleepy until the car went off the road the first time, and the jury could also have reasonably found from all the evidence that this occurred on a lonely stretch of desert road with which appellant was unfamiliar, and it might have been hazardous for him to get out of the car at that point. This being so, it cannot be said as a matter of law that appellant was guilty of contributory negligence and had assumed the risk, and it would therefore become necessary to determine whether the driver was guilty of willful misconduct under the provisions of Sec. 57-11-7, U. C. A. 1943. If the driver was guilty of willful misconduct, the court erred in directing a verdict in favor of the respondents herein.

This court in *State* v. *Olsen*, 108 Utah 377, 160 P. 2d 427, 160 A. L. R. 508, held that the fact that the defendant while driving a truck had fallen asleep and killed a child playing on a sidewalk was sufficient under the circumstances there disclosed to go to the jury on the question of negligence and whether that amounted to a marked disregard for the safety of others. See *Freedman* v. *Hurwitz*, 116 Conn. 283, 164 A. 647, and *Erickson* v. *Vogt*, 27 Cal. App. 2d 77, 80 P. 2d 533, on the fact of falling asleep while driving a car as being a factor for a jury in determination of whether the negligence was in marked disregard of the safety of others or willful misconduct under guest statutes.

Although marked disregard for the safety of others and willful misconduct are not synonymous terms they both connote a degree of carelessness greater than that present in ordinary negligence and results, under law, in similar liability. In *Bordonaro* v. *Senk,* 109 Conn. 428, 147 A. 136, 137, in which the Connecticut court had the occasion under its guest statute to interpret the meaning of heedlessness or the reckless disregard of the rights of others in defining those terms said:

"* ** * Act or conduct in reckless disregard of the rights of others is improper or wrongful conduct, and constitutes wanton misconduct, evincing a reckless indifference to consequences to the life, or limb, or health, or reputation or property rights of another.

"We define these terms in *Menzie* v. *Kalmonowitz,* 107 Conn. 197, at page 199, 139 A. 698, 699. 'Wanton misconduct is more than negligence, more than gross negligence. It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of action. Wilful misconduct is intentional misconduct, and wanton misconduct is reckless misconduct, which is the equivalent of wilful misconduct.' When we say that wanton misconduct is the equivalent of willful misconduct, we do not intend to characterize these terms as equivalents of each other, but as equivalent in result. Willful or intentional misconduct and wanton misconduct are different concepts of wrongful or improper misconduct, as we have shown, but, in their resultant, they are alike in their seriousness and gravity, and the law subjects whoever is guilty of either form of misconduct to like rules, and visits upon each a like liability. * * *"

In the instant case the evidence was uncontradicted that the driver had fallen asleep once before the occurrence of the accident and that he had fallen asleep again hours later at the time of the accident. Under such a state of facts, in my opinion, it became a question for the jury to determine whether such negligence was willful misconduct as required under our guest statute for recovery and the court erred in failing to submit this question to the jury.